**GRUENING et al. v. DONALDSON.**

No. 1329.

Municipal Court of Appeals for the District of Columbia.

Argued April 20, 1953.

Decided May 21, 1953.

Francis M. Shea, Washington, D. C., with whom Lawrence J. Latto, Washington, D. C., was on the brief, for appellants.

Albert F. Adams, Washington, D. C., with whom Daniel J. Freed, Washington, D. C., was on the brief, for appellee.

Before CAYTON, Chief Judge, and HOOD and QUINN, Associate Judges.

CAYTON, Chief Judge.

The Gruenings own a house which they had leased to one Stein. Donaldson became Stein's subtenant in February, 1951, and a few months later negotiations were had between Donaldson and the Gruenings concerning a lease directly between them. A lease having been signed by Donaldson but not by Gruening, Donaldson on April 30, 1952 gave notice that he was "terminating the tenancy of the premises" on May 31, 1952. Plaintiffs sued, claiming rent for June and July, the two months following Donaldson's termination of his tenancy. The trial judge found for defendant and plaintiffs appeal.

The basic question is whether a valid and subsisting lease was ever made between the parties. Appellants argue that the parties had arrived at a complete agreement by which they intended to be bound and that the execution of the written lease was to be a mere formality. Donaldson's position is that there never was a lease between them and that he had a right to and did terminate his tenancy.

Because of the involved nature of the protracted negotiations, it seems advisable to state the evidence in some detail for a better understanding of the legal question presented. From the testimony it is clear

that no agreement between the parties was reached prior to October 1, 1951, at which time there was a personal meeting between plaintiffs and defendant. The evidence is in direct conflict as to whether any agreement was reached at that time. Immediately thereafter, by letter dated October 1, 1951, defendant wrote Sandoz, real estate agent for plaintiffs, outlining the steps which had been taken concerning the premises and setting forth his version as to the agreements which had been reached up to that point concerning the property. The letter stated in part:

"Therefore, in view of the above, I am returning the lease which you sent us with the suggestion that a provision be made therein for sub-letting, to a tenant that is agreeable to us all, and that you furnish me with a written agreement that the property will be redecorated and the heating furnace taken care of as outlined above.

"In the meantime we will continue to occupy the property in accordance with your suggestion, on a thirty day basis. Inclosed is my check for $275 for the October rent."

Sandoz then sent to defendant in triplicate a lease embodying the specific conditions insisted upon by defendant, with the request "if satisfactory will you please sign and return all three copies?" Defendant signed the copies and returned them to Sandoz together with a letter dated October 16, 1951, and check for two months' rent (November, 1951 and August, 1952). Included in the letter was this statement: "it is my understanding that the Gruenings will sign and return a copy of this lease immediately." Gruening testified that he examined this lease in the office of Sandoz, approved it, and instructed Sandoz to send it to defendant. But there was no testimony that such approval was ever made known to defendant.

On November 17, 1951, Mrs. Gruening wrote Sandoz a letter in which she outlined certain things that were to be done to the house, complained that though the house was rented furnished defendant had moved some of their furniture out, and said: "we

must also have the guarantee that Mr. Donaldson will pay for the storage of the repaired furniture if he wishes to put it in storage and not return it to the house." The letter concluded: "Until the $100 to defray part of the expenses of articles sent to cabinet makers for repair is deposited to our account in the Riggs Bank and a guarantee that Mrs. Donaldson will pay for storage of rugs, etc., *we will keep the lease here.*" (Emphasis supplied.) That was followed by another letter from Mrs. Gruening to Sandoz which contained these statements: "Since you say Mr. Donaldson does not wish to either take care or pay for storage of furniture which was repaired by Mr. Green, *we will have to raise the rent $15 per month* and pay for storage. So please make out a *new lease* to that effect * * *. I request that you please deposit that $100 to our account for the damaged furniture *before we sign the lease with the Donaldsons at even the higher figure* * * *. We therefore insist that either we raise rent to pay for storage of repaired furniture plus $15 more a month or they allow us to return to the house * * * *When* we have a satisfactory reply upon this matter *and* you have deposited the $100 to our account you have of Mr. Stein's against breakage, etc. in the house, *we shall consider signing the lease* * * *.*" (Emphasis added.) This was followed by a letter from Mr. Gruening to Sandoz which stated: "In regard to the furniture repaired by Mr. Green, we repeat that we rented the house *furnished* to Mr. Donaldson and if he wishes to move some of the furniture out then we feel he should pay the cost of the storage—$4 or $5 a month—and the cost of carrying it to the storage warehouse. Otherwise it should be returned to the house and utilized. If Mr. Donaldson cannot be persuaded to do that, *we feel that the rent should be increased by that amount.*" (This emphasis added.)

The matter apparently remained in suspension until February 26, 1952 when Donaldson sent a letter of rescission directly to Mr. Gruening. He wrote: "I have never received notification of acceptance by either you or the Sandoz Company nor have I received a copy of the lease signed either

by you or the Sandoz Company. I hereby rescind my action in signing the aforesaid lease and I am hereby notifying you that I am occupying the property at 7926 West Beach Drive, N. W., and have since September 1, 1951, as a tenant by sufferance. Please return to me the three copies of the lease which I tendered to the Sandoz Company in October so that I may destroy them." To this Gruening replied that he considered the written form of lease to be binding and refused to return the copies. Then followed a letter of April 30, 1952 from defendant to Gruening, care of Sandoz, giving notice that he intended to vacate on May 31, 1952.

Gruening testified that he had full knowledge of the letters his wife had written and that although he had discussed their contents with her, they did not precisely represent his position; but he admitted he had not repudiated them. He said his position was fully set forth in his letter of January 14 and that it had always been his desire and intention that the premises be covered by a written lease. He also admitted that he did not sign the three copies of the lease until after receiving defendant's letter of rescission, dated February 26, 1952.

■ From the facts above recited, and from what we are about to say, we think there was a factual basis for ruling that the parties never had a meeting of minds as to the terms of the proposed letting. We also think Donaldson's letter of October 3, 1951 and his signed copies of the proposed lease may properly be held to have constituted a mere offer or counter-offer, which was not accepted by Gruening, and that hence there was no completed agreement of lease.

■ But even if we adopt the principal approach of appellant, and assume for discussion purposes that the parties ultimately arrived at a meeting of the minds as to the terms of the proposed lease (an assumption expressly rejected by appellee) the decisive question would be whether the trial judge could have found from the evidence that the parties intended that the lease should not take effect as a binding obligation until it was put into writing and executed by both

parties. We think that question must be answered in favor of the appellee, for the following reasons: (1) the fact that the parties had such extreme difficulty in reaching the agreement we have assumed, or any real agreement; (2) defendant's condition in his letter transmitting the signed copies to Sandoz that Gruening was to sign and return a copy to him immediately; (3) Mrs. Gruening's statement at least four times that the lease would not be signed until certain conditions were met; (4) her instructions to Sandoz to make out a new lease at a higher rental; and (5) the fact that Gruening held the lease for some three months and did not sign it until after receiving Donaldson's letter of rescission.

It is clear that there was ample basis for concluding that the parties did not intend to be bound by the agreement until it was executed in a formal document and that Gruening's delay in executing and returning the lease did violence to one of the express conditions of the proposed agreement.

Thus, whether the evidence be studied piece by piece or as a whole there would be no legal basis whatever for holding that the court below was required to award judgment to plaintiffs.

In the Act creating this court we were told by Congress that in cases tried without a jury "the judgment of the trial court shall not be set aside except for errors of law or unless it appears that the judgment is plainly wrong or without evidence to support it." Code 1951, § 11–772. We have also been reminded that we are not to substitute our findings for those of the trial court when "though the testimony is not sufficient to show that the trial court's decision is necessarily right, it wholly fails to show that it is necessarily wrong." Nolan v. Werth, 79 U.S.App.D.C. 33, 142 F.2d 9, 10. We find no basis whatever for holding that the decision in this case was plainly wrong, and as we have seen, it had sound support in the evidence.

■ Appellants cite 1 Underhill, Landlord and Tenant, pages 326, 328, to the effect that if a tenant enters into possession

under an unsigned lease, and pays rent which is received by the landlord, the terms of the lease are binding upon both parties. However, in this case the tenant was already in possession and whether his payment of rent and receipt thereof by the landlord constituted an acceptance of the new lease or merely a continuation of the old tenancy was one of the factors to be considered by the trier of the facts. Certainly, where both parties act in reliance upon an oral agreement they must live by their promises whether they have been formally reduced to writing or not, Means v. Direks, 10 Cir., 180 F.2d 306. But where it is intended that their agreement shall not be effective until it is evidenced by a formal lease, then the lease does not exist until it has been executed and delivered. Socony-Vacuum Oil Co. v. Elion, 126 Conn. 310, 11 A.2d 5; see, in general, 51 C.J.S., Landlord and Tenant, § 208.

Affirmed.